**PUBLIC CITIZEN, et al., Petitioners,**

v.

**NUCLEAR REGULATORY COMMISSION and the United States of America, Respondents,**

**Nuclear Utility Management and Resources Council, Intervenor.**

**No. 89–1017.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1990.

Decided April 17, 1990.

Rehearing En Banc Denied June 15, 1990.

Eric R. Glitzenstein, with whom Diane Curran, David C. Vladeck and Alan B. Morrison, Washington, D.C., were on the brief, for petitioners.

John F. Cordes, Jr., Atty., Nuclear Regulatory Com'n, with whom William C. Parler, Gen. Counsel, E. Leo Slaggie, Sp. Counsel, Nuclear Regulatory Com'n, Edward Shawaker and John Bryson, Attys., Dept. of Justice, were on the brief, for respondents.

William H. Briggs, Jr. and Karla D. Smith, Attys., Nuclear Regulatory Com'n, and David C. Shilton, Atty., Dept. of Justice, Washington, D.C., also entered appearances, for respondents.

John T. Boese, with whom Marcus A. Rowden, Washington, D.C., was on the brief, for intervenor.

Before WALD, Chief Judge, and MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

The question presented is whether the United States Nuclear Regulatory Commission must promulgate mandatory instructional requirements for the personnel training programs of civilian nuclear powerplant licensees, or whether the Commission may simply issue a "Policy Statement" that encourages, but does not compel, licensees to

create training programs that meet criteria identified in the Policy Statement. We hold that Congress has ordered the Commission to prescribe criteria to which training programs must adhere. Accordingly, since the Commission has failed to do so, we remand the case for further proceedings.

## I. BACKGROUND

In 1979, an accident at the Three Mile Island nuclear powerplant in Pennsylvania shocked the nation. A presidential commission subsequently announced that inadequate training of employees at nuclear powerplants contributed significantly to the risks posed by such plants. *See* Kemeny Commission, Report of the President's Commission on the Accident at Three Mile Island (1979). In 1983, Congress enacted § 306 of the Nuclear Waste Policy Act of 1982 [sic], 42 U.S.C. § 10226, which provides in relevant part,

> The Nuclear Regulatory Commission is authorized and directed to promulgate regulations, or other appropriate Commission regulatory guidance, for the training and qualifications of civilian nuclear powerplant operators, supervisors, technicians, and other appropriate operating personnel. Such regulations or guidance shall establish ... instructional requirements for civilian nuclear powerplant licensee personnel training programs. Such regulations or other regulatory guidance shall be promulgated by the Commission within the 12–month period following January 7, 1983[.]

In 1985, the Nuclear Regulatory Commission ("NRC" or "Commission") purported to fulfill its responsibilities under § 306 by promulgating the "Commission Policy Statement on Training and Qualification of Nuclear Power Plant Personnel," 50 Fed. Reg. 11,147 (1985) ("Policy Statement"). The Policy Statement noted that the industry's self-regulatory efforts had made progress in improving training programs. Accordingly, the Commission made a temporary decision not to engage in rulemaking, but to monitor the success of industry programs over a two-year period. There-

fore, although the Policy Statement set forth five elements as being "essential to acceptable training programs," *id.* at 11,-148, it did not mandatorily require that licensees' training programs satisfy these elements. Similarly, although the Policy Statement encouraged all licensees to have their training programs accredited by the Institute of Nuclear Power Operations, the industry's self-regulatory body, it did not actually make accreditation mandatory. The Commission stated that it would "evaluate the possible need for further NRC action based on the success of industry programs after a two-year period." *Id.* at 11,147.

In 1986, petitioner Public Citizen petitioned the Commission to issue binding regulations regarding training. First, it asked the NRC for rulemaking with respect to training, claiming among other things that the Policy Statement was insufficient to satisfy the Commission's obligations under § 306. While its petition before the Commission was pending, Public Citizen sought review in this court of the Commission's failure to issue regulations. While the lawsuit was pending, the Commission denied Public Citizen's rulemaking petition. 52 Fed.Reg. 3121 (1987). Public Citizen did not seek court review of that denial, perhaps because it already had a lawsuit pending concerning the Commission's actions. This court, however, dismissed the pending action as having been filed too late to challenge the Commission's 1985 Policy Statement and too early to be a petition for review of the denial of Public Citizen's 1986 petition for rulemaking. *Public Citizen v. NRC*, 845 F.2d 1105 (D.C.Cir.1988). Public Citizen's efforts in 1986 thus came to naught.

Then, in 1988, the Commission revisited the training issue. As promised, it reviewed the industry's efforts to satisfy the training goals outlined in the Policy Statement, and concluded that they were working. Accordingly, the Commission decided once again to refrain from making rules regarding training, and instead republished the Policy Statement with some minor amendments. 53 Fed.Reg. 46,603 (1988). From this action, the petitioners (collective-

ly referred to as "Public Citizen") petitioned for review.

## II. TIMELINESS

Before we reach the merits of Public Citizen's challenge, we must decide whether it is timely. Public Citizen's petition can be viewed as arising under either the review provisions of the Hobbs Act or those of the Nuclear Waste Policy Act, which set deadlines of 60 and 180 days, respectively, for review of NRC action. *See* 28 U.S.C. §§ 2342(4), 2344; 42 U.S.C. § 10139(c). Public Citizen filed its petition for review within 60 days of publication of the revised Policy Statement in 1988, but the NRC and the intervenors claim that it is untimely as not filed within 60 or 180 days of the NRC's promulgation of the *original* Policy Statement in 1985. They do not accept Public Citizen's contention that the NRC first issued a temporary Policy Statement in 1985, and then in 1988 reconsidered the entire training issue and decided to make its interim policy permanent. Rather, NRC and intervenors claim that the Commission made its final and permanent decision in 1985 not to issue mandatory regulations, and, in 1988, made only minor amendments to that basic policy. The Commission's 1988 actions, they argue, did not render the earlier decision not to issue mandatory regulations subject to new court challenge. According to the NRC and the intervenors, Public Citizen can now challenge only the noncontroversial 1988 amendments.

In several recent cases, this court has wrestled with the problem of whether an agency's restatement of an existing rule or policy in a rulemaking format makes the rule or policy challengeable anew, even where otherwise barred by a statutory time limit. The court has held that where an agency's actions show that it has not merely republished an existing rule in order to propose minor changes to it, but has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order. "[T]he general principle [is] that if the agency has opened the issue up anew, even

though not explicitly, its renewed adherence is substantively reviewable." *Association of American Railroads v. ICC*, 846 F.2d 1465, 1473 (D.C.Cir.1988). We have, for instance, inferred that an agency has reopened a previously decided issue in a case where the agency (1) proposed to make some change in its rules or policies, (2) called for comments only on new or changed provisions, but at the same time (3) explained the unchanged, republished portions, and (4) responded to at least one comment aimed at the previously decided issue. *State of Ohio v. U.S. E.P.A.*, 838 F.2d 1325, 1328 (D.C.Cir.1988). The language of *State of Ohio* appeared to suggest that the time period for review would start afresh in *any* case meeting the four factors just stated (and, *a fortiori*, in a case meeting factors 1, 3, and 4, and in which the agency called for comments on the whole rule, including unchanged portions). Nonetheless, more recently *American Iron & Steel Institute v. U.S. E.P.A.*, 886 F.2d 390 (D.C.Cir.1989), placed some limits on that general principle. The court there said that "[t]he 'reopening' rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency has re-opened the issue." 886 F.2d at 398.

It appears, therefore, that the crucial question at this juncture is whether an agency has in fact reopened an issue, explicitly or implicitly; the four factors mentioned in *State of Ohio* are indeed relevant evidence of reopening, but the court cannot stop there. It must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened. If in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy will be allowed. *Compare* 886 F.2d at 398 (agency did not make *sustained* attempt to explain old rule and responded to comments by at most *briefly* reiterating its

prior reasoning; issue not reopened) *with Association of American Railroads v. ICC*, 846 F.2d at 1473 (agency language was ambiguous, but because in proposing rule it had said it would attempt to "harmonize" existing decisions, a commenter who offered a compelling reason to abandon old decision would presumably have been heeded; issue reopened).

In the present case, there is fortunately no need to quibble about the precise quantum of evidence sufficient to show that the NRC reopened its prior decision not to issue training regulations. Though the Commission now claims that it never reexamined its 1985 decision, and that the petitioners therefore may challenge only the minor amendments made in 1988 to the Commission's 1985 Policy Statement, the record before us could not be clearer that the Commission's 1985 action represented a temporary decision not to engage in rulemaking on mandatory training standards, and that the 1988 action reexamined this choice and made it permanent. We cite here just a few of the many indications that this is so:

(1) The 1985 Policy Statement said that the NRC would "refrain from new rulemaking in the area of training for a minimum period of two years," and that it would "evaluate the possible need for further NRC action based on the success of industry programs after a two-year period." 50 Fed.Reg. at 11,147.

(2) In 1987, after Public Citizen petitioned the NRC for rulemaking, the Commission stated in a letter to Public Citizen that the two-year evaluation period would "expire" in early 1987. Supplemental Appendix 242.

(3) In a Federal Register statement explaining the denial of Public Citizen's rulemaking petition, the Commission stated, "[t]he Commission decided [in 1985] to withhold action on promulgating new training and qualifications regulations during a short evaluation period." The Commission also noted that it would "revisit the entire training issue around

March 20, 1987." 52 Fed.Reg. at 3124–25.

(4) The Commission's 1988 statement said that "[t]he two-year evaluation period ended March 20, 1987," that "the staff evaluated the results of the INPO accreditation program," and that "the NRC concludes that the program is effective." 53 Fed.Reg. at 46,604.

In light of these statements, we cannot but conclude that the Commission, in 1988, reopened, reexamined, and reaffirmed its 1985 decision to use exhortation rather than binding regulations to improve the training of powerplant personnel. The evidence of reopening is in fact much stronger than required by our prior cases, for the Commission did not merely implicitly reexamine its former choice; it did so explicitly. This reconsideration makes the decision subject to renewed challenge.

At oral argument, the Commission offered a different reason why the decision to issue regulations should not be challengeable. The Commission argued that its 1985 action represented its final and unreconsidered decision on the *lawfulness* of not issuing binding regulations; the 1988 action reconsidered only the *wisdom* of that decision. Thus, even if the petitioners may now raise claims directed at the wisdom of failing to issue mandatory regulations (for example, that such action is arbitrary or capricious), they may not claim that the action is contrary to law.

We reject this argument. In the first place, in light of its statements quoted above, we think the Commission's characterization of its 1985 actions as a final decision on the legality of not issuing training requirements is doubtful. It spoke then in terms of "withhold[ing] action ... during a short evaluation period," a decision which hardly raises the same legal question as a final decision not to issue training requirements. But even if we accepted the NRC's premise that it had made a final decision on the legality of not issuing mandatory regulations back in 1985, it still would not render the current challenge untimely. We held in *Environmental Defense Fund v. EPA*, 852 F.2d 1316 (D.C.Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989), that to the

extent that an agency's action "necessarily raises" the question of whether an earlier action was lawful, review of the earlier action for lawfulness is not time-barred. *Id.* at 1325; *see also Cities of Batavia, Naperville, etc. v. FERC*, 672 F.2d 64, 72 n. 15 (D.C.Cir.1982) ("While *a petition from an agency order* cannot be filed after the statutory period for filing has run, it may be that *some of the issues* that might have been raised in that appeal are so inextricably linked to a subsequent agency opinion on another aspect of the same case, that those issues may be raised in a timely appeal from the second opinion.") (emphasis in original).

In this case, the agency has reconsidered and reinstated its original policy. Such action, we think, necessarily raises the lawfulness of the original policy, for agencies have an everpresent duty to insure that their actions are lawful. An agency can hardly be heard to say that at a time when it was considering whether to take a certain action, it would have steadfastly ignored a commenter's showing that the action was unlawful. *Cf. Association of American Railroads*, 846 F.2d at 1473. We therefore think that a challenge to lawfulness is now timely. *See National Ass'n of Greeting Card Publishers v. United States Postal Service*, 607 F.2d 392, 425 n. 59 (D.C.Cir.1979) (court may examine "prior agency action on which the validity of the later agency action under review depend[s]"), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

■ Furthermore, our holding is supported by this circuit's long-standing rule that although a statutory review period permanently limits the time within which a petitioner may claim that an agency action was procedurally defective, a claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition. *See, e.g., NLRB Union v. FLRA*, 834 F.2d 191, 196 (D.C.Cir.1987); *Natural Resources Defense Council v. NRC*, 666 F.2d 595, 601-02 (D.C.Cir.1981); *Geller v. FCC*, 610 F.2d 973, 978 (D.C.Cir.1979); *Functional Music v. FCC*, 274 F.2d 543, 546 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). Were we to hold in this case that Public Citizen's challenge to the lawfulness of the NRC's action was untimely, Public Citizen could file a petition for rulemaking and then raise its claim of unlawfulness when the Commission denied the petition.[1] Such a requirement would be a waste of everyone's time and resources.[2] We believe the law to be that where an agency reiterates a rule or policy in such a way as to render the rule or policy subject to renewed challenge on any substantive grounds, a coor-

---

1. We have said that "a protestant, who could have but did not seek review, may not create the basis for a reviewable order by unilaterally petitioning for repeal or amendment of a regulation." *State of Montana v. Clark*, 749 F.2d 740, 744 (D.C.Cir.1984), *cert. denied*, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). However, as a footnote to that statement, we added that "where ... the petitioner challenges the *substantive* validity of a rule, failure to exercise a prior opportunity to challenge the regulation ordinarily will not preclude review." *Id.* at 744 n. 8. (emphasis in original). The *State of Montana* language therefore reflects our well-established rule that a procedural challenge to agency action must be brought within the statutory review period or be forever barred.

   *Natural Resources Defense Council v. NRC*, 666 F.2d 595 (D.C.Cir.1981) has also been cited for the proposition that "those who have had the opportunity to challenge general rules should not later be heard to complain of their invalidity on grounds fully known to them at the time of their issuance." *Id.* at 602. However, that statement came at the end of a paragraph which clearly drew the distinction between procedural and substantive challenges, and which stated that "we have scrutinized regulations immune from direct review by reviewing the denial of a subsequent rulemaking petition which challenged the regulations on demonstrable grounds of *substantive* invalidity." *Id.* (emphasis in original). Indeed, although the court rejected as untimely the petitioners' procedural challenge to the rule at issue, it went on to reach the merits of the petitioners' substantive challenge, *id.* at 603-06, although that challenge was equally outside the statutory deadline and equally based on grounds previously known to the petitioners. Therefore, the *NRDC* statement as well clearly applies only to procedural challenges.

2. The general policy in federal practice and procedure is to consolidate related claims between two parties into one action. *See, e.g.,* Fed.R. Civ.P. 13, 18 (joinder rules); *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (pendent jurisdiction). While we

dinate challenge that the rule or policy is contrary to law will not be held untimely because of a limited statutory review period.[3]

■ In a last-ditch effort to show untimeliness, the Commission claims that assuming it made a renewed decision not to promulgate regulations, that decision was not made in 1988, but in 1987, when, in a paper that was "made available to the public in the NRC public document room," Brief for Respondents at 23, the Commission approved a staff recommendation that it continue to defer rulemaking. Accordingly, the Commission claims, the timeliness of the petition for review should be measured from the 1987 date.

This argument borders on the frivolous. Although an agency has "considerable latitude in determining the event that triggers commencement of the judicial review period," *Associated Gas Distributors v. FERC*, 738 F.2d 1388, 1391 (D.C.Cir.1984), it must do so reasonably, *Southland Mower Co. v. United States Consumer Product Safety Commission*, 600 F.2d 12, 13 (5th Cir.1979), bearing in mind that "[b]efore any litigant reasonably can be expected to present a petition for review of an agency rule, he first must be put on fair notice that the rule in question is applicable to him." *Recreational Vehicle Industry Ass'n v. EPA*, 653 F.2d 562, 568 (D.C.Cir. 1981). We do not see how the mere placement of a decision in an agency's public files, without any other announcement, can start the clock running for review, particularly in view of the Hobbs Act's require-

ment that agencies promptly give notice of their final orders by service or publication, 28 U.S.C. § 2344, and the Administrative Procedure Act's provision that no person may be adversely affected by a matter required to be published in the Federal Register and not so published, 5 U.S.C. § 552(a)(1). Potential petitioners cannot be expected to squirrel through the Commission's public document room in search of papers that might reflect final agency action.[4]

Accordingly, we find the petition for review to be timely.

### III. MERITS

■ On the merits, the crucial question before us is one of the Commission's discretion to pursue its preferred regulatory philosophy. The NRC has decided that the best way to get civilian nuclear powerplant licensees to improve training in their powerplants is not to impose mandatory requirements upon them, but rather to create what is in effect a "model training code" for powerplant operators, and to urge that licensees voluntarily comply with this code. Normally, of course, an agency is free not to exercise its compulsory powers if it thinks simple exhortation would be sufficient to achieve its regulatory mission. The precise question at issue is whether Congress removed this discretion from the NRC by passing § 306.

■ In resolving the difference between the interpretations of § 306 offered by the petitioners and by the Commission, we apply the rules laid down in *Chevron U.S.A.,*

could not, of course, ignore a jurisdictional barrier in the name of judicial economy, *see Finley v. United States*, — U.S. ——, 109 S.Ct. 2003, 2010, 104 L.Ed.2d 593 (1989) (policy of *Gibbs* does not extend to bringing new parties into a case), we think considerations of economy properly reinforce our decision that the NRC's restatement of its policy necessarily raises the issue of the policy's lawfulness, so as to bring that issue within our unquestioned jurisdiction to review the agency's most recent action.

3. This is not to say that there may not be some other bar to the challenge, such as *res judicata,* collateral estoppel, or failure to exhaust administrative remedies, and *stare decisis* may make such a challenge unlikely to succeed. Our holding relates only to the limitations imposed by a statutory review period. In this case, no other limitation applies.

4. Furthermore, the documents in question here do not read anything like a final agency order. SECY–87–121, *reprinted in* Joint Appendix ("J.A.") 69–74, the staff document approved by the Commission, recommends that the Commission continue to defer rulemaking, but also recommends that the Commission direct the staff to continue to evaluate industry implementation of the Policy Statement and to revise the Policy Statement. J.A. 74. This is hardly the stuff of which final orders are made; indeed, the Commission's approval of the staff recommendations demonstrates that it was still in the process of reconsidering the Policy Statement. We doubt whether a challenge to the Commission's approval of SECY–87–121 would even have been within our jurisdiction to review final agency orders.

*Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we must decide "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. In determining the intent of Congress, we must look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and we must employ traditional tools of statutory construction, including, where appropriate, legislative history. *Ohio v. United States Department of the Interior,* 880 F.2d 432, 441 (D.C.Cir.1989). If the intent of Congress is clear, we must give it effect. 467 U.S. at 842–43, 104 S.Ct. at 2781 ("*Chevron* step one"). If, however, the statute is silent or ambiguous on a particular issue, we must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statutory purpose. *Id.* at 844–45, 104 S.Ct. at 2782–83 ("*Chevron* step two"). We begin, therefore, by inquiring whether Congress made its intent on the question before us clear in § 306.

## A. The Language of § 306

■ On its face, § 306, quoted earlier, sets out four essential conditions for NRC compliance with its mandate:

(1) The NRC's action must take the form of *regulations* or *other appropriate Commission regulatory guidance;*

(2) The NRC's action must *establish instructional requirements* for civilian nuclear powerplant licensee personnel training programs;

(3) The NRC's action must be *promulgated;* and

(4) The NRC's action must be promulgated *within 12 months of January 7, 1983.*

The two key phrases in § 306 for our purposes are "regulatory guidance" and "establish ... instructional requirements."

### 1. *"Regulatory Guidance"*

Section 306 does not compel the NRC to promulgate regulations; it requires regula-tions *or* other appropriate "regulatory guidance." Congress' use of the term "guidance" in § 306 is what keeps this case from being trivial. To give "guidance" certainly can mean, in ordinary parlance, to give advice, or suggestions. The term is not inconsistent with the notion of mandatory regulations, but neither is it inconsistent with a hortatory, rather than a mandatory, administrative regime.

The section, of course, does not simply require "guidance"; it requires "regulatory guidance." However, we do not believe the modifier "regulatory" clarifies the ambiguity in the word "guidance." The term "regulatory guidance" is not a well-established term of art. Indeed, § 306 appears to have been the first section in the entire United States Code to use the term, and a computer-assisted search reveals that apart from its use in § 306, the term "regulatory guidance" now appears in just two other places in the Code. The first place is 15 U.S.C. § 2641(a)(1), the "findings and purpose" section of the Asbestos Hazard Emergency Response Act (AHERA). Section 2641(a)(1) notes that because of the "lack of regulatory guidance" from the EPA, some schools have not undertaken response action to the problem of asbestos. The AHERA therefore requires the Administrator of the EPA to promulgate regulations establishing procedures for determining whether asbestos is present in school buildings and defining and requiring the implementation of appropriate response actions. § 2643.

The other place in which the term appears is in 20 U.S.C. § 1234b(c), a section of the National Assessment of Educational Progress Improvement Act. The section deals with the ability of the United States to recover education funds improperly spent by states and localities. The section provides that recovery of misspent funds shall be reduced if there are mitigating circumstances; the term mitigating circumstances is narrowly defined to include only a few situations, such as when the state or locality actually and reasonably relies on erroneous written guidance provided by the Department of Education. § 1234b(b)(2). The section concludes by saying that "[t]he Secretary shall periodically review the written requests for guidance submitted under

this section to determine the need for new or supplementary regulatory or other guidance under applicable programs." § 1234b(c).

This concluding distinction between "regulatory" and "other" guidance suggests that regulatory guidance is guidance provided by regulations. This provision seems to tell the Secretary to decide, based on the volume of requests for guidance received, whether a particular point could best be resolved by the issuance of a general regulation. Like the AHERA's curing of the "lack of regulatory guidance" by requiring the creation of binding regulations, this provision therefore suggests that "regulatory guidance" is not a mere suggestion, but guidance provided in a binding regulation.

However, we do not think these two usages of the term (both of which, incidentally, came after the enactment of § 306) establish a clear meaning for the somewhat arcane term. The heavily optional flavor of the word "guidance" suggests that "regulatory guidance" could also mean guidance from a regulatory agency; that is, the very sort of set of voluntary suggestions that the NRC has promulgated here. Accordingly, if § 306 said only that the NRC was required to promulgate regulations or other appropriate regulatory guidance concerning plant personnel training, we would hold that it was ambiguous as a *Chevron* step one matter.

2. *"Establish ... Instructional Requirements"*

However, apart from "regulations or other appropriate regulatory guidance," § 306 provides another, clearer indication of Congress' intent. The statute decrees that the regulations or guidance, whatever they be, must "establish ... instructional *requirements* for civilian nuclear powerplant licensee personnel training programs" (emphasis added). The word "requirements," unlike the word "guidance," clearly suggests a mandatory regime. Certainly in common parlance "requirement" means something compelled, not merely suggested.

More important, the congressional command to "establish requirements," unlike the command to give "regulatory guid-

ance," is a familiar one. Numerous statutes instruct an agency to establish requirements, and almost always in a context that makes clear that the requirements must be mandatory. For instance, 30 U.S.C. § 871 provides that "[e]ach coal mine shall be provided with suitable firefighting equipment.... The Secretary [of Labor] shall establish minimum requirements for the type, quality, and quantity of such equipment." One would hardly surmise from this language that Congress wanted the Secretary merely to exhort coal mine operators to have minimally suitable firefighting equipment on hand; indeed, 30 U.S.C. § 861(b) provides that "[t]he purpose of this subchapter is to provide for the immediate application of mandatory safety standards[.]" Similarly, 22 U.S.C. § 4022 provides that "[t]he Secretary [of State] shall establish foreign language proficiency requirements for members of the Service who are to be assigned abroad.... The Secretary of State shall arrange for appropriate language training of members of the Service ... in order to assist in meeting the[se] requirements." Clearly, the requirements must be met; one could not picture the Secretary merely exhorting his own subordinates to learn necessary foreign languages. Numerous other examples could be cited. *See, e.g.,* 15 U.S.C. § 78o(c)(3) (SEC shall by rule or regulation establish minimum financial responsibility requirements for brokers and dealers); 42 U.S.C. § 6922 (EPA shall promulgate regulations establishing standards which shall establish requirements for generators of hazardous waste). Congress uses very different language when instructing an agency to establish nonmandatory guidance. *See, e.g.,* 42 U.S.C. § 6962(e) (EPA shall prepare guidelines for procuring agencies which shall "set forth recommended practices" for purchasing recycled goods).

Thus, when Congress commanded the NRC to "establish ... instructional requirements," it used a common statutory formula and so must have intended to invoke the formula's clear, well-understood meaning. *Cf. Heckler v. Chaney,* 470 U.S. 821, 835, 105 S.Ct. 1649, 1657, 84 L.Ed.2d

714 (although statute provided that those who violate its substantive provisions "shall be imprisoned ... or fined," this language is commonly found in criminal statutes and does not divest enforcing agency of enforcement discretion). A call for "requirements" assumes that the regulated community will be required to follow training dictates.

## B.   Legislative History

The legislative history also supports our reading of the statutory text. Senator Lowell Weicker, the author of § 306, stated that it "require[s] that the Nuclear Regulatory Commission—within the next 12 months—proceed to develop *firm regulations* for the proper training and requalification of nuclear powerplant operators, supervisors, technicians, and other appropriate plant personnel." 128 Cong.Rec. 32,-543 (1982) (emphasis added). Senator Weicker went on to say that there was a need for the NRC immediately to "undertake the effort to establish *firm regulations and guidelines* for [operator] training programs," *id.* (emphasis added), and that in view of the large number of plant personnel that would be hired over the next decade, "it would be folly to enter this period of intensive recruitment without *strict guidelines and regulations* outlining how these personnel are to be trained." *Id.* at 32,544 (emphasis added). Senator Weicker's statements clearly show that he intended the section to compel the NRC to establish mandatory requirements for operator training programs.

Of course, the remarks of a single legislator regarding a bill are not controlling as to its interpretation. *See, e.g., United States v. McGoff,* 831 F.2d 1071, 1090 (D.C. Cir.1987).[5] In this case, however, the remarks simply reinforce what the language

of the bill already makes clear: that Congress commanded the NRC to develop mandatory requirements. The remarks also strongly suggest that we are correct in reading the ambiguous term "regulatory guidance" as meaning some form of mandatory instruction, at least in the context of this statute.

## C.   NRC Arguments

The NRC urges that we interpret the phrase "establish ... instructional requirements" in light of the term "regulatory guidance." Since the latter term, according to the Commission, clearly provides that the Commission need not issue mandatory regulations, the term "requirements" cannot have its ordinary meaning. We disagree, however, for two reasons.

First, even if we assumed that the term "regulatory guidance" unambiguously referred to a set of nonmandatory suggestions, we would not agree that the Commission could satisfy its obligations under § 306 by simply issuing such suggestions. The issuance of regulatory guidance would satisfy only *one* of the Commission's four clear obligations under § 306.  The second sentence of § 306 unequivocally shows that whatever the Commission's regulatory guidance is, it must establish instructional requirements, and nonmandatory suggestions fail to do this. When Congress gives an agency its marching orders, the agency must obey all of them, not merely some. The NRC cannot claim to fulfill its obligations under § 306 by issuing regulatory guidance unless that regulatory guidance establishes instructional requirements.

Second, we do not believe that the term "regulatory guidance" unerringly points to a set of nonmandatory suggestions. Rather, as discussed previously, we find that term itself to be ambiguous. Its usage in

5. The petitioners argue that we should give Senator Weicker's statements more weight than a single legislator's statements usually receive, because of the unusual circumstances surrounding the enactment of § 306: the section was appended to the Nuclear Waste Policy Act on the last day of the legislative session, and since there was no time for it to go to committee, the bill's managers in the two houses of Congress negotiated the text of the section and established a legislative history by submitting state-

ments and colloquies for publication in the Congressional Record. *See* 128 Cong.Rec. 32,944 (1982). This process, according to the manager for the House, represented "the full equivalent of a conference report." *Id.* Inasmuch, however, as we hold that the meaning of the section itself is clear and that Senator Weicker's statements merely reinforce that meaning, we find it unnecessary to consider whether they should receive more weight than that usually accorded to statements of a key legislative player.

other statutes suggests that an equally plausible meaning is some form of mandatory instruction from a regulatory agency. Of course, when a statute that is entrusted to an administrative agency contains an ambiguous term, it is generally for the agency, rather than for this court, to interpret that term, within the bounds of reason and consistently with the statute's purpose. But in this case, the NRC has taken the impermissible step of plucking the ambiguous term out of its context in the statute, interpreting it in a vacuum, and then twisting the meaning of the unambiguous term in the statute to fit its interpretation of the ambiguous one. This is going about statutory interpretation backwards. When a statute contains a clear term and an ambiguous term, the ambiguous term must be interpreted in light of the clear one, not vice-versa.

The NRC therefore erred in deciding that the term "requirements" was ambiguous in light of its reading of the term "regulatory guidance." Rather, the clear command that the NRC establish instructional requirements suggests that the ambiguous term "regulatory guidance" should be construed in accordance with the principle *ejusdem generis:* since "regulatory guidance" is a general term that is coupled with a specific one ("regulations"), it should take its meaning from the specific term. Whatever regulatory guidance is, it must share the crucial quality of regulations; that is, it must be mandatory.

■ The Commission also argues that its Policy Statement establishes what amount to requirements, in view of the practicalities of the relationship between the NRC and the regulated community of nuclear powerplant licensees. The Commission claims that its policy statement "require[s] licensees to develop personnel training programs that [meet] the guidelines or, if they contemplated any significant changes or delay, be prepared to justify their actions to the NRC or face NRC enforcement action." Brief for Respondents at 31. The Commission argues that "setting out clear guidelines for training programs in the policy statement and related documents,

backed by vigorous oversight and an enforcement policy whereby enforceable orders or license conditions would issue if training or qualification deficiencies were found to exist amount[s] to promulgating 'requirements' as the term is used in section 306." *Id.* at 30.

We simply do not see how these alleged characteristics of the current enforcement regime, even if accurately described, satisfy the congressional command to establish training "requirements." The Commission concedes that "unlike a regulation, a policy statement is not a 'binding norm' that is immediately enforceable when its terms are violated." *Id.* at 31 n. 22. At oral argument, the Commission's counsel conceded further that the failure of a licensee to follow the suggestions contained in the Policy Statement could not itself be the basis for an enforcement action against the licensee; the Commission would be obliged to show that the licensee's plant was unsafe as that term is defined by statute and the NRC's enforceable regulations. Thus, when the Commission claims that "enforceable orders or license conditions would issue if training or qualification deficiencies were found to exist," it cannot mean that the sufficiency of training would be measured by the Policy Statement. The Commission, of course, can always take action against a licensee under its general power to insure that powerplants are safely operated, but the Policy Statement adds nothing to the Commission's arsenal of enforcement powers; since the Policy Statement is not an enforceable rule, the Commission, in any enforcement action, would be obliged to support its policy by reference to other authorities just as if the Policy Statement did not exist. *See Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974). Therefore, while it may well be that most or even all licensees comply with the Policy Statement voluntarily, to say that compliance is a requirement is to mock the word "requirement."

. The Commission might perhaps be arguing that its whole process of issuing the Policy Statement, monitoring industry's compliance, and imposing enforceable conditions on licensees that do not comply, amounts to establishing requirements within the meaning of § 306. That is, the Com-

**158**

mission might be saying that it can establish requirements by a continuing process that includes case-by-case impositions of requirements on particular licensees. If this is what the Commission is saying, however, it will not do. Normally, to be sure, an agency has considerable discretion to establish norms by adjudication rather than by rulemaking. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). Section 306, however, directs the Commission to "promulgate" its regulations or regulatory guidance, which immediately suggests rulemaking rather than adjudication, and goes on to say that the regulations or guidance must be promulgated "within the 12–month period following" January 7, 1983. This deadline is clearly inconsistent with a policy of establishing requirements by a process of case-by-case adjudication. The thing the Commission promulgates must itself establish requirements. This the Policy Statement fails to do.

Finally, the Commission and the intervenor argue that the Commission's imposition of mandatory requirements will make the nuclear power industry *less* safe, because it will choke off the industry's self-regulatory efforts; licensees will regard the Commission's requirements as a maximum rather than a minimum level of appropriate training. Whatever we thought of the merits of this argument, we would have no authority to disregard the means that Congress has chosen to achieve its objective of improved training. The Commission and the industry must take this argument to the Congress, not to the courts.

### IV. CONCLUSION

We believe the language and history of § 306 clearly support the petitioners' claim that the Commission's actions have not satisfied its obligations under that section. We hold, under *Chevron* step one, that the intent of Congress in passing § 306 is clear, and that the Commission must follow it. Because Congress directed the NRC to create mandatory requirements for civilian nuclear powerplant licensee personnel training programs, and because the Commission has failed to do so, we remand the case to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*

On Suggestions for Rehearing *En Banc*

A statement of Circuit Judge WILLIAMS, joined by Circuit Judges SILBERMAN, D.H. GINSBURG and SENTELLE, is attached.

WILLIAMS, Circuit Judge, concurring in the denial of the suggestions for rehearing *en banc*: The Court here takes a statute directing the Commission to "promulgate regulations [, or other appropriate Commission regulatory guidance]" for various purposes, and produces something quite different, completely shorn of the bracketed language. I would call for rehearing *en banc*, but the statute appears unique and, perhaps more important, it seems to me not beyond the reach of agency expertise to devise "regulations" that preserve most if not all of the flexibility the Commission sought and, correctly I think, believes lawful. Certainly other agencies have done so. See, e.g., *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952).