NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Plaintiffs,

v.

Delos Cy JAMISON, et al., Defendants.

Civ. A. No. 82–2763.

United States District Court,
District of Columbia.

Dec. 8, 1992.

**456**

Timothy Biddle, Washington, DC, for Nat. Coal Ass'n, intervenor. Steven P. Quarles, Crowell and Moring, Washington, DC, for State of Wyo., intervenor.

Eugene D. Gulland, Coving and Burling, Washington, DC, for Shell Oil Co., intervenor.

Glenn P. Sugameli, National Wildlife Federation, Washington, DC, for plaintiff National Wildlife Federation.

Melinda Taylor, National Audubon Soc., Washington, DC, for plaintiff Nat. Audubon Soc.

Johanna H. Wald, Natural Resources Defense Council, Inc., William S. Curtiss, Sierra Club Legal Defense Fund, Inc., San Francisco, CA, for plaintiffs.

### MEMORANDUM AND ORDER

BRYANT, Senior District Judge.

*Background*

The sale and mining of federal coal implicate a large number of overlapping statutory mandates.[1] Congress has delegated broad authority to the Secretary of the Interior to promulgate regulations in keeping with those mandates.[2]

Under Department of the Interior regulations, the process by which federal coal lands may be leased and mined proceeds in four basic stages, or tiers. First, the Bureau of Land Management ("the Bureau") engages in land use planning, determining potential uses for large areas of federal land, at which time the Bureau may locate coal deposits potentially appropriate for mining. The Bureau must prepare a "comprehensive" land use plan to permit future coal lease sales.[3]

During land use planning the Bureau identifies areas acceptable for further consideration for coal leasing by applying four "screens":

1) the potential for development of coal;

2) a list of "unsuitability criteria" mandated by various statutes;

3) multiple-use tradeoffs, including alternate resource values; and

4) surface owner opposition.[4]

Second, the Bureau engages in resource-focused activity planning, and delineates specific tracts for coal leasing.[5] At this stage the Bureau prepares a regional lease sale Environmental Impact Statement ("EIS"), as required by the National Environmental Policy Act ("NEPA"), assessing the impact of leasing the proposed sites.

Third, the Bureau conducts a lease sale.[6] Such sales may occur under procedures for

---

1. Mineral Lands Leasing Act of 1920, ch. 85, 41 Stat. 437, 30 U.S.C. §§ 181–287 (1988 & Supp. II 1990) ("MLA"), *as amended by* Federal Coal Leasing Amendments Act of 1976, Pub.L. No. 94–377, 90 Stat. 1083, 30 U.S.C. §§ 184, 191, 201–209, 352 (1988) ("FCLAA"); Surface Mining Control and Reclamation Act of 1977, Pub.L. No. 95–87, 91 Stat. 445, 30 U.S.C. §§ 1201–1328 (1988 & Supp. II 1990) ("SMCRA"); National Environmental Policy Act of 1969, Pub.L. No. 91–190, 83 Stat. 852, 42 U.S.C. §§ 4321–4370c (1988 & Supp. II 1990) ("NEPA"); Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, 90 Stat. 2743, 43 U.S.C.A. §§ 1701–1784 (West 1986 & Supp.1992) ("FLPMA").

2. MLA at 30 U.S.C. § 189; SMCRA at 30 U.S.C. § 1211(c)(2); FLPMA at 43 U.S.C. § 1733(a).

3. FCLAA at 30 U.S.C. § 201(a)(3)(A)(i) (1988).

4. *See* 43 C.F.R. § 3420.1–4(e)(1) (1991) (development potential screen); 43 C.F.R. § 3420.1–4(e)(2) (1991) (unsuitability criteria screen); 43 C.F.R. § 3461.5 (1991) (list of unsuitability criteria); 43 C.F.R. § 3420.1–4(e)(3) (1991) (multiple-use tradeoff screen); 43 C.F.R. 1601.0–5(f) (1991) (definition of "multiple use"); 30 C.F.R. § 762.5 (1992) (definitions of other values considered in multiple-use land decisions); 43 C.F.R. § 3420.1–4(e)(4) (1991) (surface owner opposition screen); 3400.0–5(gg) (1991) (definition of "surface owner").

5. 43 C.F.R. § 3420.3–4(c) (1991).

6. 43 C.F.R. Part 3420 (1991).

"competitive leasing"[7] or under "leasing on application"[8] where in the activity planning stage private entities have requested specific tracts, generally adjacent to existing mining operations. In the case of so-called "split estate"[9] lands, where the government owns coal but private parties own surface rights, sales may take place only after potential bidders obtain the written consent of all "qualified" surface owners and present them to the Bureau.[10]

Fourth, in the case of surface mining, lessees have three years, absent extraordinary circumstances, to submit an "operation and reclamation plan" which must be approved by the Office of Surface Mining Reclamation and Enforcement ("Office of Surface Mining") before a mining permit will be issued.[11] Lessees carry the burden of demonstrating in their operation and reclamation plan that the land they seek to mine can be reclaimed.[12] Lessees then have ten years, absent extraordinary circumstances, to commence mining "commercial quantities" of coal, or their lease will be terminated.[13]

The regulatory scheme by which the Department of the Interior authorizes the sale and mining of federal coal dates in large part to 1979.[14] Plaintiffs brought this suit in 1982, after the Secretary substantially modified the 1979 regulations in an effort to ease the burden on parties seeking to obtain federal coal.[15] The Department of the Interior promulgated final rules on July 30, 1982.[16] On September 28, 1982 plaintiffs filed their eleven count Complaint, alleging violations of the MLA, FCLAA, SMCRA, NEPA, FLPMA, and the Administrative Procedure Act ("APA").[17]

A number of plaintiffs' 1982 challenges have been resolved. In count I, plaintiffs claimed that the 1979 regulations constituted "major Federal actions significantly affecting the quality of the human environment," which under NEPA must be preceded by publication of an EIS.[18] Count II alleged that the defendants based their decision not to prepare a new or supplemental EIS upon an inadequate environmental assessment. Count III alleged that, in violation of the APA, defendants "failed to provide adequate explanations" for significant changes made in the coal leasing program, and that those changes had "no basis in the record."[19] Congress suspended a large part of all federal coal leasing in September 1983. In the summer of 1984 the Secretary of the Interior administratively suspended all regional coal lease sales and undertook a review and revision of the entire federal coal leasing program. On October 4, 1985, the Department completed a Final Supplemental Environmental Impact Statement ("SEIS") on the coal leasing program. On February 21, 1986, the Secretary made a further series of decisions regarding coal leasing, contained in the 1986 Secretarial Issue Document ("SID"), and resumed federal coal leasing.

Granting a Joint Motion on May 9, 1986, the court dismissed plaintiffs' claims in count I ("Failure to Prepare an Environmental Impact Statement"), count II ("Failure to Pre-

---

7. 43 C.F.R. Subpart 3420 (1991).

8. 43 C.F.R. Subpart 3425 (1991).

9. 43 C.F.R. § 3400.0–5(kk) (1991) (definition of "split estate" lands).

10. SMCRA at 30 U.S.C. § 1304(e); 43 C.F.R. § 3400.0–5(gg) (1991) (definition of "qualified" surface owner); 43 C.F.R. Subpart 3427 (1991) (procedures for obtaining written consent).

11. FCLAA at 30 U.S.C. §§ 207(c), § 1211; 43 C.F.R. § 3483.3(a)(1) (1991).

12. 30 U.S.C. § 1260(b)(2); 30 C.F.R. § 773.-15(a)(2) (1992).

13. FCLAA at 30 U.S.C. § 207(a). *See also* 43 C.F.R. Subpart 3483.3(a)(1) (1991).

14. 44 Fed.Reg. 14,902–15,463, 42,584–42,652, 46,386–46,401 (1979).

15. Plaintiffs include the Natural Resources Defense Council, Inc., the Sierra Club, the National Wildlife Federation, the National Audubon Society, the Environmental Policy Institute, the Northern Plains Resource Council, the Western Organization of Resource Councils, and the Powder River Basin Resource Council.

16. 47 Fed.Reg. 33,114–33,195 (1982).

17. 5 U.S.C. §§ 551 *et seq.* (1988).

18. 42 U.S.C. § 4332(c).

19. Complaint at 29.

pare Adequate Environmental Assessment") and count III ("Violation of Administrative Procedure Act") as being substantially satisfied.[20] The court dismissed count VII ("Violation of the Mineral Leasing Act") as moot, since it was determined that the Department would subject all lands covered by pending preference right lease applications to an unsuitability review.[21] The 1985 and 1986 departmental actions changed the status of plaintiffs' counts IV, V, and VIII, which required rebriefing. Counts VI, IX, X and XI remained unchanged.[22]

On November 1, 1988, the court granted defendants' Motion for Summary Judgment based upon plaintiffs' failure to demonstrate standing to bring suit.[23] On November 9, 1989, however, the court granted plaintiffs' Motion for Reconsideration and on June 6, 1990 the court vacated its previous Order, finding Article III subject matter jurisdiction to hear plaintiffs' claims, based upon plaintiffs' submission of fifteen affidavits identifying specific tracts of land used by their members, tracts which have been affected by the disputed regulations.[24] Supplemental briefing on a number of issues concluded September 1990.

Six issues remain for determination.

First, count IV charges that even after changes embodied in the 1986 SID, the coal leasing program continues to violate the land use planning requirements of FCLAA and FLPMA in regard to: 1) activity planning suspended in 1984, 2) emergency leasing, 3) leasing on application, and 4) preference right lease applications. Second, count V charges that the failure to include reclaimability in the "unsuitability criteria" screen applied during land-use planning violates SMCRA.[25] Third, count VIII charges that agency procedures for public participation in coal leasing decisions spelled out in an agency handbook do not meet FLPMA's requirement that such procedures be provided for by regulation. Fourth, count IX charges that the failure to apply FCLAA's ten-year deadline for "diligent development" of coal to leases pre-existing at the time FCLAA became law violates FCLAA.[26] Fifth, count X argues that FCLAA's three year deadline for submission of an operation and reclamation plan cannot be extended by regulations to include a *force majeure* exception. Finally, count XI charges that the 1982 regulations do not guarantee SMCRA's requirement that no coal will be leased without the written consent of qualified surface owners.

**20.** April 22, 1986 Joint Motion at 2; May 9, 1986 Order at 1. The court subsequently ruled that plaintiffs were not entitled under the Equal Access to Justice Act to attorneys' fees and expenses incurred in litigating counts I, II, and III because the position of the United States was "substantially justified." August 6, 1992 Order at 7–8.

**21.** April 22, 1986 Joint Motion at 2. The term "preference right lease" is not mentioned in the MLA. It is used by the Department of the Interior or in regulations governing lease applications by holders of prospecting permits for coal, phosphate, sodium, sulphur, and potassium. Preference right lease applications ("PRLAs") are discussed at 43 C.F.R. Subpart 3430 (1991). *See also NRDC v. Berklund,* 609 F.2d 553, 556 n. 6 (D.C.Cir.1979).

**22.** Further, 1987 changes in the unsuitability criteria regulations became the occasion for additional challenges to the coal leasing program in a related case. *National Wildlife Federation v. Lujan,* C.A. No. 88–0301.

**23.** *NRDC v. Burford,* 716 F.Supp. 632 (D.D.C. 1988).

**24.** *NRDC v. Jamison,* 787 F.Supp. 231 (D.D.C. 1990). That decision is distinguishable from *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In contrast to *Lujan,* in this case plaintiffs' members have set forth specific facts showing actual use of lands affected by the disputed decisions, and defendants have long since conceded for all practical purposes that the Department of the Interior has, through a related group of regulations and secretarial decisions, taken final agency action with respect to the "coal leasing program." SID at 21.

**25.** In count VI of their Complaint, plaintiffs allege that the Department of the Interior refuses to apply the SMCRA reclaimability unsuitability criteria to other federal lands, including lands already under lease. This issue has been briefed together with count V, with which it is closely related, and the two issues will be considered together.

**26.** FCLAA requires leaseholders mine "commercial quantities" of coal. 30 U.S.C. § 207(a). The implementing regulations use the term "diligent development" for this requirement. *See* 43 C.F.R. Subpart 3483 (1991).

*Standard of Review*

The Secretary of the Interior has been granted broad statutory authority to administer the MLA, FCLAA, SMCRA, and FLPMA. As a result, in regard to those statutory schemes this court applies the two standards articulated in *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First, in what is colloquially known as *Chevron* "prong one," where "Congress has directly spoken to the precise question at issue.... that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. at 2781. On the other hand, in what is known as "prong two" of *Chevron,* "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2781. The judicial determination

of what is permissible requires deference; the standard is essentially one of reasonableness. The court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." 467 U.S. at 844, 104 S.Ct. at 2782.

1. *Count IV, Land Use Planning Requirements of FCLAA and FLPMA*

Land use plans for coal lease sales must meet the statutory requirements of the Federal Coal Leasing Amendments Act of 1976 ("FCLAA") and the Federal Land Planning and Management Act of 1976 ("FLPMA"). As a general matter, FCLAA forbids the Secretary of the Interior to issue a coal lease without prior preparation of a "comprehensive" land use plan, but leaves that term largely undefined. 30 U.S.C. § 201(a)(3)(A)(i).[27] Any coal lease sale must be "compatible with" that plan.[28] By contrast, FLPMA provides explicit criteria for required planning of all public lands.[29] 43

---

27. FCLAA did identify several elements that a "comprehensive land-use plan" *must contain:* (1) consultation with state agencies and local governments, and the general public; (2) an assessment of the amount of coal deposits attainable by means of "deep mining operations" and "by surface mining operations"; and (3) an evaluation of the impact of mining on the environment and on agricultural and other economic activities, and public services. *See* 30 U.S.C. § 201(a)(3).

28. 30 U.S.C. § 201(a)(3)(A)(i).

29. FLPMA states that the Secretary shall:
(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;
(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;
(3) give priority to the designation and protection of areas of critical environmental concern;
(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;
(5) consider present and potential uses of the public lands;
(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;
(7) weigh long-term benefits to the public against short-term benefits;
(8) provide for compliance with applicable pollution control laws, including State and

Federal air, water, noise, or other pollution standards or implementation plans; and
(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located, including, but not limited to, the statewide outdoor recreation plans developed under the Act of September 3, 1964 (78 Stat. 897), as amended [16 U.S.C. § 4601–4 *et seq.*], and of or for Indian tribes by, among other things, considering the policies of approved State and tribal land resource management programs. In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal land use plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practicable, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary

U.S.C. § 1712(c). The requirements of FLPMA are generally recognized as sufficient to meet FCLAA's requirement that plans be "comprehensive," although FCLAA has never been amended to require FLPMA plans.[30]

The new type of sophisticated land-use plans FLPMA mandates are known as "resource management plans" ("RMPs"). RMPs are developed pursuant to regulations originally promulgated August 7, 1979, and amended May 5, 1983 ("the RMP regulations") detailing how the planning requirements of FLPMA, as well as related statutes, should be met.[31]

The RMP regulations contain a section ("the FLPMA transition period regulations") providing for a transition period during which land use plans predating FCLAA and FLPMA, known as management framework plans ("MFPs"), may continue to serve as the basis for agency actions if they meet certain limited requirements.[32]

In order to serve as the basis specifically for a *coal lease sale*, however, regulations promulgated July 19, 1979 ("the 1979 coal leasing regulations") required that pre-existing MFPs be amended to meet a number of additional substantive criteria.[33] The 1979 coal leasing regulations also set a December

with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.
43 U.S.C. § 1712(c).

**30.** There is indirect legislative history to the effect that the type of plan ultimately mandated by FLPMA is "the kind of land use plan contemplated by the [Federal Coal Leasing] amendment." S.Rep. No. 296, 94th Cong., 1st Sess. 14 (1975).

**31.** 44 Fed.Reg. 46,386–46,401 (1979) *as amended* 48 Fed.Reg. 20,364–20,375 (1983); (codified at 43 C.F.R. Part 1600 (1991) (titled Planning, Programming, Budgeting)).

**32.** FLPMA transition period regulations codified *as amended,* 48 Fed.Reg. 20,364, 20,375 (1983), at 43 C.F.R. § 1610.8 (1991). Under the transition period regulations, pre-FLPMA land use plans must be amended so as to be:

[I]n compliance with the principle of multiple use and sustained yield and shall have been developed with public participation and governmental coordination, but not necessarily precisely as prescribed in §§ 1610.2 and 1610.3 of this title.
43 C.F.R. § 1610.8(a)(1).
The term "multiple use" is defined as:
[T]he management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of

balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.
43 C.F.R. 1601.0–5(f) (1991).

**33.** 44 Fed.Reg. 42,584, 42,617 (1979). The 1979 coal leasing regulations required the Secretary to have:

(1) Considered a range of present and potential resource values and uses in accordance with the principles of multiple use and sustained yield;
(2) Used necessary professional disciplines in the analysis of resource development proposals;
(3) Identified critical environmental areas, if any;
(4) Reflected available, relevant data commensurate with anticipated conflicts in values and potential uses, and with likely levels and impacts of such uses;
(5) Developed and analyzed alternative proposals for multiple resource development and use;
(6) Analyzed the significance of values that would be affected by proposed actions in terms of local, regional and national perspectives, consistent with agency directives; and
(7) Been formulated in consultation with appropriate state and local governments and agencies and with the opportunity for public participation, including a public hearing if requested by an adversely affected party.
43 C.F.R. § 3420.1–5(c) (1981).

31, 1984 deadline for phasing out reliance on amended MFPs. After December 31, 1984, activity planning with respect to any coal deposits administered by the Bureau of Land Management could not be initiated without an RMP developed in conformity with the full RMP regulations.[34]

On July 30, 1982 the Department of the Interior promulgated new regulations eliminating the 1979 coal leasing regulations' substantive criteria for judging the adequacy of amended MFPs.[35] Since then, amended MFPs used for coal leasing are held to the general transition period requirements of the RMP regulations.[36] The 1982 regulations also eliminated the December 31, 1984 deadline for coal leasing based on amended MFPs. The two changes mean that coal leasing based on land use plans meeting only the FLPMA transition period regulations may apparently continue indefinitely.

In count IV of their Complaint, plaintiffs charged that the 1982 regulatory scheme's failure to include "specific" criteria to evaluate whether an amended MFP was "comprehensive" violated FCLAA, and that the failure to include a deadline for the complete transition to RMPs violated FLPMA and constituted agency action unlawfully withheld.[37] Events since 1982 substantially alter the nature of count IV. In May of 1983 the Department of the Interior indicated its intent to develop RMPs "as rapidly as possible."[38] The Department suspended coal lease sales in the summer of 1984 to undertake a thorough review of the coal management program, which had become highly controversial after the 1982 changes, and had been largely suspended by Congress in September 1983.[39] In regard to requiring RMPs as a basis for coal leasing, the Secretary of the Interior considered four options:

(1) Any land use plan meeting the requirements of BLM or Forest Service land management planning regulations would be acceptable as the planning base for further coal leasing activities....

(2) New regional coal lease sale activity planning would be initiated only in those areas where RMPs have been completed. The regional coal lease sale activity planning suspended during the program review would proceed based on the land use plans in effect. Emergency leasing, leasing by application, and PRLA processing may proceed based on MFP amendments.

•    •    •    •    •

(3) No regional leasing of any kind would occur until RMPs have been completed. This includes sales in those regions where regional coal lease sale activity planning was suspended during the program review. Emergency leasing, leasing by application, and PRLA processing may proceed based on MFP amendments....

(4) No leasing of any kind—i.e., no regional leasing, leasing by application, and emergency leasing, and no PRLA processing—would occur until RMPs are completed.

SID at 34–36.

On February 21, 1986, the Secretary chose option (2), and the Department resumed coal leasing activity. SID at ES–3. Plaintiffs now challenge continued reliance upon amended MFPs under the transitional provisions of the RMP regulations for: 1) areas where activity planning had been initiated prior to the 1984 suspension of coal lease sale activity planning, 2) emergency leasing, 3) leasing by application, and 4) preference right lease applications. Defendants continue to argue, as they did in 1982, that the amended MFPs in question meet all the requirements of the "applicable statutes," namely FCLAA, SMCRA, and FLPMA.[40]

---

34. 43 C.F.R. § 3420.1–5(e) (1981).

35. 47 Fed.Reg. 33,114, 33,136 (1982).

36. Transition period regulations codified at 43 C.F.R. § 1610.8 (1991).

37. Complaint at 30.

38. 48 Fed.Reg. 20,364, 20,367 (1983).

39. SID at ES–1, ES–4.

40. 47 Fed.Reg. 33,114, 33,118 (1982). In response to public comment criticizing elimination of the deadline for phasing out use of amended MFPs as a basis for coal leasing, the Bureau of Land Management explained that the Bureau "plans to use resource management plans as soon as they are available, but, in some cases, the current planning schedule will not produce re-

Furthermore, defendants argue that preference right leases are not covered by the regulations governing competitive coal .lease sales.[41]

## A. The Requirements of FCLAA

FCLAA requires that activity planning for coal lease sales be preceded by a "comprehensive" . land use plan. 30 U.S.C. § 201(a)(3)(A)(i). The Department of the Interior initially limited its discretion in how to meet FCLAA's statutory mandate by providing binding, enforceable criteria, in the form of regulations, by which the comprehensiveness of land use plans could be judged.[42] In 1982 the Department abandoned that approach and now proceeds on a case-by-case basis, leaving aggrieved parties no choice but to .challenge the statutory validity of questionable land use plans one at a time. However, no language in FCLAA requires that the Department of the Interior promulgate regulations to articulate its interpretation of what a "comprehensive" land use plan requires. Congress knows how to require an agency to proceed by rulemaking.[43] Absent such a statutory mandate, agencies may choose whether or not to limit their discretion through rulemaking. See SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) ("the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency"); Independent U.S. Tanker Owners Committee v. Lewis, 690 F.2d 908, 917 (D.C.Cir.1982), (agency not "legally obligated to limit its discretion through rulemaking"). An agency promise to "meet the requirements of applicable statutes" will not be assumed to be made in bad faith. Congress has never amended FCLAA to explicitly provide that only plans meeting the full requirements of FLPMA would be "comprehensive." Consequently, the regulations do not, on their face, violate FCLAA. Plaintiffs must challenge individual land use plans they believe are not "comprehensive."

## B. . The Requirements of FLPMA

■ The issue for the court is whether indefinite delay in replacing plans that meet only the FLPMA transition period regulations with plans meeting the full RMP regulations is lawful.

In contrast to FCLAA, the Department of the Interior has limited its discretion in how to meet FLPMA by promulgating a clear regulatory program requiring preparation of RMPs. It is beyond contention that RMPS are the type of plan FLPMA requires. "Land use plans mandated by [FLPMA] are called 'Resource Management Plans.' "[44] 1983 amendments to the regulations allegedly demonstrated the Department of the Interior's intent "to . complete resource management plans for lands under its jurisdiction as rapidly as possible, on a priority basis, within fiscal and manpower constraints."[45] The Department's own 1986 planning document tacitly acknowledged that amended MFPs

source management plans by December 31, 1984. In those instances, the Bureau will rely upon management framework plan amendments *that meet the requirements of applicable statutes.*" *Id.* (emphasis added). Specifically, defendants assert that when MFPs are relied upon in coal activity planning (under the 1979, 1982, and 1986 versions of the Program), they must be amended to add:

1) application of the twenty unsuitability criteria as listed at 43 C.F.R. § 3461.5 (1991);

2) an assessment of coal development potential as required by FCLAA, 30 U.S.C. ·. § 201(a)(3)(B) (*implemented at* 43 C.F.R. 3420.1–4(e)(1) (1991));

3) the results of consultation with surface owners as required by SMCRA, 30 U.S.C. § 1304(d); and

4) review and determination that the amended MFP is in "compliance with the [FLPMA] princi-

ple of multiple use and sustained yield" under the FLPMA transition period regulations. 43 C.F.R. § 1610.8(a)(1) (1991). .

**41.** In keeping with the discussion below, the court need not reach this issue. ·

**42.** 43 C.F.R. § 3420.1–5(c) (1981).

**43.** For example, *compare* 43 U.S.C. § 1712(c) (Secretary directed *to consider various* enumerated criteria in the development and revision of land use plans) *with* 43 U.S.C. § 1712(f) (Secretary directed to establish *by regulation* certain procedures for public involvement in formulation of plans for public land management).

**44.** 44 Fed.Reg. 46,386 (1979).

**45.** 48 Fed.Reg. 20,364, 20,367 (1983)..

cannot meet the substantive requirements of FLPMA, by disputing only whether the delay in meeting those substantive requirements had *already* been excessive. "Nine years have passed since the passage of the Federal Land Policy and Management Act, which some believe is *more than enough time* for the Bureau to bring its planning base into compliance with the statute." SID at 35 (emphasis added). Six more years have since passed without such compliance.

FLPMA mandates that land use plans in keeping with the statute's substantive requirements "shall be developed," 43 U.S.C. § 1712(a). If the Bureau has effectively abandoned movement toward elimination of amended MFPs, giving them de facto permanence, then the statutory requirement that the agency "develop" plans is being violated.[46]

If on the other hand the Bureau is inching toward eventual compliance, the problem is more complex.[47] FLPMA does not contain a statutory deadline, and Congress clearly anticipated some transitional period during which continued reliance on older plans would not violate the statute.[48] However, what is transitional must have an end. The Department of the Interior's position, in effect, is that because it has applied some part of its limited resources toward the goal of developing RMPs, it is still in compliance with FLPMA, even though fifteen years have passed since FLPMA became law and RMPs have still not been prepared for a number of areas.[49]

■■■ The Department of the Interior has not made clear whether it is proceeding very slowly toward full implementation of FLPMA's mandate, or has actually abandoned the attempt to complete Resource

46. *See also* 43 U.S.C. § 1701(a)(2), "the national interest will be best realized if the public lands and their resources are *periodically* and *systematically* inventoried...." (emphasis added).

47. If an agency simultaneously promulgated two regulatory schemes as alternative means of implementing a statute, one scheme a permissible interpretation of the statute and the other not, the courts could invalidate the impermissible scheme. However, if the agency implemented the two schemes but called the impermissible one "transitional," when would that scheme become ripe for review? If the agency relied exclusively on the "transitional" scheme, the subterfuge would become obvious. If the agency relied on both schemes, the mere labeling of one as transitional should not forever insulate it from review. The lack of a sunset provision in transitional regulations should alert courts to the potential for evasion. With the passage of time, failure to repeal transitional provisions becomes reviewable as agency action unreasonably delayed.

48. *See* 43 U.S.C. § 1732(a) (referring to use of FLPMA land use plans "when they are available"); 43 U.S.C. § 1712(d) ("Any classification of public lands or any land use plan *in effect* on October 21, 1976, is subject to review in the land use planning process....") (emphasis added).

49. The SID focuses on deciding what types, if any, of coal leasing should be permitted to go forward based on amended MFPs, rather than on deciding how the Department will achieve full compliance with FLPMA. The SID gives three reasons for the Secretary's decision to permit continued leasing based upon amended MFPs.

First, "substantial fiscal resources" had already been spent on amending MFPs. SID at 32. This is not a reason for present failure to prepare RMPs, as the earlier expenditures would have been required anyway to meet the transition period regulations, unless the Bureau had chosen not to sell any leases until RMPs were ready.
Second, the SID claims that waiting for RMPs to be completed would result in "substantial delays" in offering certain tracts for lease. *Id.* The Department gave its estimate that some lease sales might be delayed as long as 36 months pending completion of RMPs. *Id.* at 36. Since then (1986) more than six years have passed with no indication that the RMPs will be completed.
Third, "the Department previously stated that the MFPs supporting these leasing activities, which were amended to bring them into compliance with FLPMA, are adequate documents." *Id.* at 32. The SID pointedly fails to indicate that amended MFPs *are* actually adequate, claiming only that the agency once asserted they were. The Department's difficulty is that the MFPs amended between 1982 and 1986 were brought into compliance with the FLPMA *transition period* regulations. While that may have been adequate at one time, it cannot remain so forever.
These reasons address the Department's desire to permit interim coal leasing, but constitute a weak rationale for further delay in full implementation of RMPs. Given that these three reasons form the core of the Department's 1986 argument for delay, it is not surprising that an admitted disadvantage of the option chosen by the Secretary is that "[t]he risk ... [of] successful litigation ... is high." *Id.* at 35.

Management Plans for all federal lands to which FLPMA applies, which would be illegal. Until it learns otherwise the court will assume delay.

However:

> There comes a point when what has been designated a "temporary measure" lasts for so long, and shows so little sign of being terminated in the foreseeable future, that to continue to categorize it as "temporary" is to ignore the realities of the situation.

*MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 344 (D.C.Cir.1980) (citing *American Broadcasting Co. v. FCC*, 191 F.2d 492, 500–501 (D.C.Cir.1951)). FLPMA became law fifteen years ago. Failure to eliminate the transition period regulations eventually becomes unreasonable. This court has jurisdiction to compel "agency action unlawfully withheld or unreasonably delayed."[50] In *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C.Cir.1984) ("TRAC") the court articulated six factors to be weighed in determining whether agency delay is so egregious as to warrant mandamus:

(1) the time agencies take to make decisions must be governed by a "rule of reason,";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

750 F.2d at 80 (citations omitted).

Because Congress did not include a statutory timetable in the FLPMA planning requirements, a determination of reasonableness in this case will require greater emphasis on factors (3)–(5). At this time the court lacks an adequate factual basis to "test the delay . . . against the above standard to determine if it is egregious enough to warrant mandamus." *TRAC*, 750 F.2d at 80. The case is currently before the court on cross-motions for summary judgment, but proper weighing of these factors will require "a number of factual determinations. . . ." *Cutler v. Hayes*, 818 F.2d at 896. Before deciding whether or not to issue a writ, the court will require more information in particular on the effect mandating completion of RMPs would have on competing agency priorities, and the nature of the interests actually prejudiced by the agency's failure to complete RMPs.

However, as the *TRAC* court wrote, "[w]hether or not these delays would justify mandamus, we believe they clearly warrant retaining jurisdiction." *TRAC*, 750 F.2d at 81. The interim action adopted by the TRAC court seems appropriate here. *See also MCI v. FCC*, 627 F.2d at 345. Within thirty days the Department of the Interior shall advise the court of a feasible schedule

---

**50.** 5 U.S.C. § 706(1). Suits seeking such a remedy raise two special jurisdictional issues. First is the question whether the power to compel such action vests exclusively in the court of appeals. In *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 75 (D.C.Cir.1984) ("TRAC"), the court held that "[w]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals." However, neither FCLAA nor FLPMA contains such a direct review provision. Thus the district court has jurisdiction under the All Writs Act, the mandamus statute, and 28 U.S.C. § 1331, the general federal question statute. *See Cutler v. Hayes*, 818 F.2d 879, 887 n. 61 (D.C.Cir.1987). Second, unreasonable delay cases seem to require judicial review even where there is no final agency action. However, the court of appeals has held that in this context the finality requirement is prudential and does not preclude reviewing claims of unreasonable delay. *TRAC*, 750 F.2d at 75 n. 27. *See also Public Citizen Health Research Group v. FDA*, 740 F.2d 21, 30 (D.C.Cir. 1984).

for completion of resource management plans for the Big Dry, Great Divide, Green River, and White River resource areas, and any other areas, if any, "in which there is a potential for surface mining."[51] Prior to completion of these RMPs, any party may petition the court to take additional appropriate action as may be warranted.

### 2. Count V, Absence of SMCRA's Reclaimability Requirement in the Unsuitability Criteria

In enacting SMCRA, the Surface Mining Control and Recovery Act of 1977, Congress sought to ensure that land which cannot be reclaimed will not be mined. "The whole concept of this bill ... is based upon the proposition that certain areas cannot be mined. Certain areas can only be mined where they can be reclaimed...."[52] SMCRA requires that where reclamation of federal lands is not "technologically or economically feasible," the Secretary of the Interior must declare the land unsuitable for coal leasing. 30 U.S.C. §§ 1272(a)(2), 1272(b). SMCRA contains a sixty-day statute of limitations, 30 U.S.C. § 1276, which defendants allege has been exceeded because the regulations implementing the portions of SMCRA at issue here were promulgated in 1979 and not changed in 1982.

### A. SMCRA's Statute of Limitations

■ The original 1979 proposed regulations implementing the coal leasing program included SMCRA's requirement of reclaimability in its list of more than twenty "unsuitability criteria" to be applied during land use planning.[53] After notice and comment, the Department of the Interior deleted reclaimability from the "unsuitability criteria" in the final rules effective July 19, 1979.[54] Plaintiffs participated in the 1979 rulemaking but did not at that time challenge the absence of reclaimability in the unsuitability criteria.[55]

In February 1981, following a change of administrations, the Department of the Interior called for comments on how it might make its regulatory schemes less burdensome. On December 16, 1981, after what appears to be extensive reexamination of the coal leasing program, the Department promulgated proposed amendments "as part of the effort to streamline the Department of the Interior regulations and reduce the burden imposed on the public by unneeded regulations...."[56] The agency promulgated final rules July 30, 1982, effective August 30 of that year.[57] Plaintiffs filed suit on September 28, 1982.

The 1982 regulations left unchanged the provisions plaintiffs challenge here: namely the absence of reclaimability as one of the unsuitability criteria applied during land use planning. Defendants claim that as a consequence plaintiffs are barred by SMCRA's sixty-day statute of limitations.

This circuit has frequently wrestled with the issue of what events renew the statute of limitations on an unchanged agency rule or regulation. In *Montana v. Clark*, 749 F.2d 740 (D.C.Cir.1984), *cert. denied*, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985), the agency held out the unchanged provision as a proposed regulation, offered an explanation of its language, and solicited and responded to comments concerning it. The court found sufficient "affirmative indications that the agency evaluated the entire substance of the regulation" to permit review. *Id.* at 744.

In *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C.Cir.1988) the EPA: 1) proposed some changes in a regulatory scheme, 2) requested comments only on the new or changed provisions 3) explained the unchanged but republished portion of the regulations, and 4) responded to at least one comment aimed directly at the unchanged regulations. The

51. Defendants' August 17, 1990 Supplemental Memorandum at Attachment A.

52. Remarks of Senator Metcalf, floor manager for SMCRA. 123 Cong.Rec. 15,695 (1977).

53. 44 Fed.Reg. 16,800, 16,838 (1979).

54. 44 Fed.Reg. 42,584, 42,604 (1979).

55. Defendants' August 26, 1983 Memorandum in Support of Their Cross–Motion for Summary Judgment at 69.

56. 46 Fed.Reg. 61,390 (1981).

57. 47 Fed.Reg. 33,114–33,195 (1982).

court found a challenge to the unchanged regulation permissible, holding that where the agency "by some new promulgation creates the opportunity for renewed comment and objection," review of unchanged portions of the regulations becomes appropriate. *Id.* In *Association of American Railroads v. ICC,* 846 F.2d 1465, 1473 (D.C.Cir.1988), the ICC proposed rulemaking only to "supplement" an older rule. Nevertheless, the court found jurisdiction, arguing that the Commission had stated that it would "attempt to *harmonize*" its past decisions, "possibly suggesting that the search for harmony might lead to a rethinking of old positions." *Id.* "[T]he general principle [is] that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable." *Id.* In *Public Citizen v. NRC,* 901 F.2d 147, 150 (D.C.Cir. 1990), *cert. denied,* 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990), the court of appeals held that where the court makes a determination that, as a factual matter, the agency "has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order."

> [T]he crucial question ... is whether an agency has in fact reopened an issue, explicitly or implicitly; the four factors mentioned in *State of Ohio* are indeed relevant evidence of reopening, but the court cannot stop there. It must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened.

901 F.2d at 150.

Of course, it must be the *agency* which has reopened the issue. "The 'reopening' rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had reopened the issue." *American Iron & Steel Institute v. EPA,* 886 F.2d 390, 398 (D.C.Cir. 1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). Similarly,

while plaintiffs may petition for a rulemaking and challenge a denial of that petition on *substantive* grounds, *Public Citizen v. NRC,* 901 F.2d at ·152, they may not use such petitions to permit "back door *procedural* challenges by those who had the opportunity to seek direct review of regulations but failed to do so in a timely fashion." *Natural Resources Defense Council, Inc. v. NRC,* 666 F.2d 595, 602 (D.C.Cir.1981) (emphasis added).

In the present case, in keeping with the deregulatory philosophy of an incoming administration, the Department of the Interior invited comment on, and implied a willingness to fundamentally reevaluate, all its regulatory programs. The Department of the Interior by its own actions unsettled the finality which provides the primary policy rationale for statutes of limitations. As a factual matter, considering the full record of events that transpired after 1979, including changes in other, related parts of the regulations which in their impact may have "fundamentally altered ... [the] program," *MCI Telecommunications Corp. v. FCC,* 765 F.2d 1186, 1190 (D.C.Cir.1985), there can be little doubt that in 1982 the Department of the Interior reopened the issue of how the coal leasing program would comply with the requirements of SMCRA. Therefore plaintiffs' SMCRA challenges are not time-barred.[58]

B. *The Substantive Requirements of SMCRA*

■ Under SMCRA, the Secretary of the Interior must review all federal lands to identify those areas where "reclamation ... is not technologically or economically feasible." 30 U.S.C. § 1272(a)(2). The Secretary must determine such unreclaimable areas "unsuitable for all or certain types of surface coal mining operations." 30 U.S.C. § 1272(b). Plaintiffs argue that SMCRA requires that this determination of unsuitability for surface mining due to unreclaimability must be made during the land use planning

---

**58.** Consequently, the court need not here reach the issue of whether the Secretary's reexamination of the coal management program and 1986

actions in regard to the unsuitability criteria, *see* SID at DS–3, independently trigger renewal of SMCRA's statute of limitations.

stage of Bureau decision-making.[59] In support of their interpretation, plaintiffs cite SMCRA's requirement that:

> [D]eterminations of the unsuitability of land for surface coal mining, as provided for in this section, shall be integrated *as closely as possible* with present and future land use planning and regulation processes at the Federal, State, and local levels.

30 U.S.C. § 1272(a)(5) (emphasis added).

Currently, the Office of Surface Mining makes this determination for the Secretary after a lease has already been sold, based upon information provided by the lessee in the operation and reclamation plan submitted at the time the lessee seeks a permit to begin surface mining operations.[60] Before a permit application can be approved, the regulations have always required the leaseholder to affirmatively demonstrate that:

> [S]urface coal mining and reclamation operations, as required by the Act, this chapter, and the regulatory program, can be feasibly accomplished under the mining and reclamation operations plan contained in the application.[61]

Defendants argue that the phrase "as closely as possible" leaves the Department of the Interior substantial flexibility as to how best to integrate that requirement into the overall coal management regulatory scheme. The court agrees. In the context of delegating authority to an administrative agency, a determination of what is possible must be practical rather than theoretical. The statute can most reasonably be read as an instruction to integrate the various regulatory regimes to the greatest extent feasible, leaving to the agency in the first instance the determination of feasibility.

The regulations first proposed by the Department of the Interior in 1979 did include reclaimability among the "unsuitability criteria" considered during land use planning.[62] After notice and comment, the Department deleted reclaimability from the unsuitability criteria (along with wetlands and prime farm lands), because:

> [T]hese determinations cannot by made by the Bureau of Land Management at the pre-lease stage without significant expenditures of money and personnel; and the values are fully protected in the mine plan approval process under the Office of Surface Mining's permanent program regulations.[63]

"An initial agency interpretation is not instantly carved in stone." *Chevron,* 467 U.S. at 863, 104 S.Ct. at 2791. The Department of the Interior gave eminently reasonable grounds for its 1979 decision not to make the reclaimability determination during land use planning. The 1979 concern for rational allocation of limited resources remains just as valid today:

> During land use planning, BLM may look at vast areas. Although these areas are under review, they will not be subject to coal leasing because other resource values are accorded a higher preference, such as, grazing, agricultural, recreational, timber production, etc. It is not effective use of resources to determine whether or not an area can be mined when that area would not be mined any way [sic] because of other competing resource values. Since the determination of reclaimability is highly technical and resource intensive, it makes sense to apply it on a site specific basis, and this is what happens during the permit application phase. It is at this time that the coal operators submit the wealth

---

59. In count VI of their Complaint, plaintiffs allege that the Department of the Interior refuses to apply the SMCRA reclaimability unsuitability criteria to other federal lands, including lands already under lease. Plaintiffs' September 4, 1990 Supplemental Memorandum at 4. *See* 43 C.F.R. § 3461.3–2 (1991). Defendants maintain that the unsuitability requirements are applied to lands already under lease during the mine plan review stage. Defendants' August 26, 1983 Memorandum in Support of Their Cross–Motion for Summary Judgment at 72. Consequently counts V and VI are closely related and can be resolved together.

60. 30 C.F.R. Part 780 (1992).

61. 30 C.F.R. § 786.19(b) (1981).

62. 44 Fed.Reg. 16,800, 16,838 (1979).

63. 44 Fed.Reg. 42,584, 42,604 (1979).

of data required by SMCRA....[64] The Department advanced "a reasonable explanation for its conclusion that the regulation serves the ... objectives" of the statute. *Chevron,* 467 U.S. at 863, 104 S.Ct. at 2791. Plaintiffs raise the concern that after major investments by the purchaser of a lease, it will be politically impossible for the Office of Surface Mining to deny lessees a permit to mine, even if the land is not reclaimable.[65] This concern addresses the wisdom of defendants' regulatory scheme, not its legality. The court will not assume future illegal conduct by the Department of the Interior. The current regulatory scheme is not ideal. Among its weaknesses, it largely obstructs judicial oversight of SMCRA's guarantee that land which cannot be reclaimed will not be mined. The court is aware of the practical difficulties facing a plaintiff trying to challenge the issuance of a permit on the grounds the permit violated SMCRA's reclaimability requirement. Nevertheless, the regulation is not invalid on its face.

3. *Count VIII, Opportunities for Public Participation under FLPMA*

■ Section 202(f) of FLPMA requires that:

> The Secretary shall allow an opportunity for public involvement and *by regulation* shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

43 U.S.C. § 1712(f) (emphasis added). Similarly, section 309(e) FLPMA, which provides for advisory councils, requires that:

> [T]he Secretary, *by regulation,* shall establish procedures, including public hearings

where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

43 U.S.C. § 1739(e) (emphasis added).

Plaintiffs' count VIII challenges not the substance of the public participation procedures adopted by the Secretary, but the lack of regulations implementing those provisions.[66] Plaintiffs correctly assert that Congress has mandated implementation of the public participation provisions by regulation, leaving no discretion to the agency. Congress has addressed this "precise question." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. Both sections 309(e) and 202(f) of FLPMA use the imperative "shall" and specify that their public participation opportunities will be established "by regulation." "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781.

Defendants respond to these undeniable facts by suggesting that plaintiffs' insistence on the protection provided by regulations "trivialize[s] Section 309(e) of FLPMA"[67] since public participation procedures are spelled out in an agency handbook, and the handbook cannot be changed such as to terminate public participation without violating the Federal Advisory Committee Act.[68] Whether or not the stability of the current public participation rules is adequately guaranteed without additional regulations is a policy question. Congress left the Secretary no discretion in how to provide that guaran-

**64.** Defendants' August 26, 1983 Memorandum in Support of Their Cross–Motion for Summary Judgment at 71 (footnotes omitted).

**65.** Plaintiffs' September 4, 1990 Supplemental Memorandum at 5–6.

**66.** Plaintiffs' original complaint alleged a failure to provide for adequate public participation, because the 1982 regulations deleted earlier regulations providing such opportunities. The Depart-

ment of the Interior has since provided for public participation, in procedures spelled out in a "competitive coal leasing handbook." Plaintiffs' May 29, 1986 Supplemental Memorandum at 12.

**67.** Defendants' June 17, 1986 Supplemental Memorandum at 23.

**68.** 5 U.S.C.A. appx. 2 §§ 1–15 (1988 & Supp. III 1991).

tee: notice and comment rulemaking. Consequently plaintiffs' Motion for Summary Judgment on this count must be granted.

4. *Count IX, Application of the FCLAA Diligent Development Requirement*

■ FCLAA, the Federal Coal Leasing Amendments Act of 1976, sought to stop speculation in coal leases by requiring that, in the future, holders of coal leases actually mine the coal they lease. In relevant part, FCLAA states that:

A coal lease shall be for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities from that lease. Any lease which is not producing in commercial quantities at the end of ten years shall be terminated.

30 U.S.C. § 207(a).

The Department of the Interior has, in its regulations, interpreted FCLAA to apply the "diligent development" requirements to preexisting leases only "[u]pon the effective date of the first lease readjustment after August 4, 1976," when FCLAA became law.[69] Readjustments may occur when the original lease expires, and then at the end of each subsequent ten-year period if a lease is extended. 30 U.S.C. § 207(a). Under preexisting law, readjustment permits the government to change the royalty rate and other conditions of a lease. *Id.*

Plaintiffs argue that the ten year time limit to achieve commercial levels of production, the "diligent development" requirement, should be applied to pre-existing leases as well. Plaintiffs rely on the fact that the statute does not distinguish between new and pre-existing leases, referring simply to "[a]ny lease." *Id.*

■ Congress' failure to provide explicitly for pre-existing leases actually argues in favor of defendants' interpretation of the statute. Pre–FCLAA leases are contracts whose terms would be retroactively modified by application of the diligent development requirement. It is a basic principle of statutory construction that when Congress legislates with retroactive effect, it does so explicitly. "Words in a statute ought not to have a retrospective operation, unless they are so clear, strong and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied." *United States v. Heth,* 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806) (Paterson, J., concurring). "Retroactivity, even where permissible, is not favored, except upon the clearest mandate." *Claridge Apartments Co. v. Commissioner,* 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944).[70]

In FCLAA, Congress provided penalties for failure to develop coal for each of three classes of leases: newly issued after August 4, 1976, readjusted after that date, and pre-existing but not yet readjusted. Under the most reasonable interpretation of FCLAA, the lease-termination penalty applies to the first two classes, while an alternative penalty applies to the third:

The Secretary shall not issue a lease or leases ... to any person ... [who] has held a lease or leases for a period of ten years when such entity is not ... producing coal from the lease deposits in commercial quantities. In computing the ten-year period referred to in the preceding sentence, periods of time prior to August 4, 1976, shall not be counted.[71]

---

**69.** 43 C.F.R. § 3483.1(b)(2) (1991).

**70.** In addition, whenever possible the courts will construe statutes so as to avoid raising constitutional issues. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"). It is apparent to this court,

as it was in Congress, that retroactive application of the diligent development requirements has the potential to "trigger constitutional questions involving the taking of legislatively conferred rights...." Remarks of Congresswoman Mink, Chairperson of the House Subcommittee on Mines and Mining, explaining that the "tough provisions" of the bill were not intended to be applied retroactively. 122 Cong.Rec. 486 (1976).

**71.** 30 U.S.C. § 201(a)(2)(A). *See also* 43 C.F.R. § 3472.1–2(e)(1)(i) (1991).

Congress did not apply the penalty of lease-termination for failure to mine commercial quantities of coal retroactively, but only to new leases and newly readjusted leases. Failure to develop pre-existing leases prior to readjustment triggers only the less severe penalty of being ineligible to acquire any new leases. Because leaseholders arguably have no present contractual or property interest in acquiring additional leases at some future time, Congress avoided acting retroactively. The legislative history supports this reading.[72] In short, Congress intended that the diligent development requirement apply only to post-FCLAA leases and extensions of pre-FCLAA leases.

5. *Count X, FCLAA's Deadline for Submission of Operation and Reclamation Plans*

■ FCLAA requires coal leaseholders to submit operation and reclamation plans, which must be approved before mining may begin:

Prior to taking any action on a leasehold which might cause a significant disturbance of the environment, and *not later than three years* after a lease is issued, the lessee *shall submit* for the Secretary's approval an operation and reclamation plan. The Secretary shall approve or disapprove the plan or require that it be modified.

30 U.S.C. § 207(c) (emphasis added).

Defendants have promulgated regulations which extend this three year deadline for submission of a resource recovery and protection plan by:

the period of time in which the authorized officer determines that operations under the Federal coal lease or L[ogical] M[ining] U[nit] are interrupted by strikes, the elements, or casualties not attributable to the operator/lessee.[73]

Plaintiffs argue that a *force majeure* exception for planning is inconsistent with the statute. Congress provided a statutory *force majeure* exception to the requirements that leaseholders mine commercial quantities of coal within ten years and each subsequent year. 30 U.S.C. § 207(b). Defendants argue that "[i]t follows *a fortiori*, that if a lease may be extended for a period of time, so too must the operator's obligations under the lease and statute to submit a mine plan; the two go hand-in-hand."[74] In fact, the statute draws a clear distinction between mine operation and the planning which must take place prior to mining.

In enacting the penalty of lease termination for failure to meet the diligent development requirements, Congress permitted only two exceptions: where the Secretary determines that the public interest will be served by permitting that advance royalties be paid instead, and where "*operations* under the lease are interrupted by strikes, the elements, or casualties not attributable to the lessee." 30 U.S.C. § 207(b) (emphasis added). The statutory three year deadline for submitting operation and reclamation plans is mandatory, unambiguous, and provides for no exceptions. " '[S]hall' . . . is the language of command . . . ." *Escoe v. Zerbst*, 295 U.S.

---

**72.** The Senate Committee Report stated that FCLAA would prevent lessees from holding leases indefinitely without production "under future leases" S.Rep. No. 296, 94th Cong., 1st Sess. 15 (1975). The House Committee Report was even clearer. "Old leases would be exempt from this provision [termination for failure to produce in commercial quantities], except to the extent it might be made applicable upon readjustment of lease terms." H.R.Rep. No. 681, 94th Cong., 1st Sess. 15 (1975). Comments from the House floor also support this interpretation. Congressman Drinan: "Leases already in existence would be exempt from this provision, but the lessees could not acquire any new leases while they continue to hold nonproducing tracts." 122 Cong.Rec. 497 (1976). Congressman Baucus: "[T]he 534 existing leases will not have to pro-

duce coal until 10 years after the next scheduled readjustment of lease terms, which in many cases will not be for 15 or 20 years." 122 Cong.Rec. 25,464 (1976). Congresswoman Mink responded to a presidential veto of the legislation, subsequently overridden, by addressing the issue directly. "The 534 existing leases would be subject to this provision only to the extent that it is inserted in lease terms at the next scheduled readjustment period . . . ." 122 Cong.Rec. 25,093 (1976).

**73.** 43 C.F.R. § 3483.3(a)(1) (1991).

**74.** Defendants' August 26, 1983 Memorandum in Support of Their Cross–Motion for Summary Judgment at 83.

490, 493, 55 S.Ct. 818, 818, 79 L.Ed. 1566 (1935).

Defendants also argue that under *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 372, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973) the fact that Congress provided a *force majeure* clause in only one context does not prevent the agency from providing for such a clause by regulation in another context. In *Mourning,* the Court held that Congress, in explicitly providing for disclosure of certain transactions in the Truth In Lending Act, did not preclude the Federal Reserve Board from requiring disclosure of certain other transactions. 411 U.S. at 372–373, 93 S.Ct. at 1662. *Mourning* is what would now be generally recognized as a *Chevron* "prong two" case, where the agency exercised delegated powers in a permissible interpretation of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. By contrast, the present case involves no ambiguity in the statute. The absolute three-year deadline and the more flexible ten-year deadline both give explicit expression to legislatively negotiated choices on hotly debated issues. Consequently the purported extension of the three year deadline for submission of operation and reclamation plans is impermissible.

### 6. *Count XI, Surface Owner Consent*

■ "Split Estate" lands are lands where the United States owns coal deposits and private parties own surface rights. SMCRA sought to protect some of these split estate surface landowners against surface coal mining of their land without their consent. In relevant part, SMCRA provides that in cases where coal to be leased is to be mined by other than underground techniques:

> The Secretary shall not enter into any lease of Federal coal deposits until the surface owner has given written consent to enter and commence surface mining operations and the Secretary has obtained evidence of such consent.

30 U.S.C. § 1304(c).

SMCRA confines its definition of a "surface owner" to those persons who:

(1) hold legal or equitable title to the land surface;

(2) have their principal place of residence on the land; or personally conduct farming or ranching operations upon a farm or ranch unit to be affected by surface coal mining operations; or receive directly a significant portion of their income, if any, from such farming or ranching operations; and

(3) have met the conditions of paragraphs (1) and (2) for a period of at least three years prior to the granting of the consent.

30 U.S.C. § 1304(e).

Plaintiffs object to the 1982 regulations implementing 30 U.S.C. § 1304(e) because, in contrast to the 1979 regulations they replace, the new regulations shift the burden of proof to the alleged surface owner to demonstrate that he or she meets SMCRA's requirements under § 1304(e), in effect "failing to *guarantee* that leasing will not proceed without the consent of qualified owners." [75] The new regulations state that:

> If the surface owner fails to provide evidence of qualifications in response to surface owner consultation or to a written request for such evidence, and if the authorized officer is unable to independently determine whether or not the surface owner is qualified, the authorized officer shall presume that the surface owner is unqualified. The authorized officer shall notify the surface owner in writing of this determination and shall provide the surface owner an opportunity to appeal the determination.[76]

To include land in a lease sale, the Bureau of Land Management must receive prior written consent from every qualified surface owner. As a practical matter, the Bureau must implement some procedure for determining who those qualified surface owners are. The Bureau has adopted some procedural safeguards in the event of a dispute involving a person who refuses consent and is found to be unqualified:

---

**75.** Plaintiffs' July 21, 1983 Memorandum in Support of Their Motion for Summary Judgment at 73.

**76.** 43 C.F.R. 3427.2(j) (1991).

The authorized officer shall in all cases notify the person or persons filing the ... statement of refusal to consent of the results of the review of the filing, including any request for additional information needed to satisfy the requirements of this subpart in cases where insufficient information was supplied with the original filing.[77]

If unable to satisfy such a request to the satisfaction of that officer, the landowner may appeal to the State Director of the Bureau of Land Management, the National Director, and ultimately to the courts.[78] Lease sales may continue during this appeals process, but that is only in keeping with the general principle that agency action will not be presumed unlawful prior to a judicial determination.

Under *Chevron*, if the statute is clear, that is the end of the matter. 467 U.S. at 842, 104 S.Ct. at 2781. The statute is clear as to the absolute veto surface owners meeting the requirements of § 1304(e) exercise over lease sales. However, nothing in the regulatory scheme conflicts with the statute.

In addition, plaintiffs argue that the regulations fail to "specify that refusals to consent last the life of land use plans"[79] but instead last only for the current activity planning cycle.[80] In fact, a surface owner refusing consent during an activity planning cycle, and found to be qualified under § 1304(e), remains protected indefinitely against surface mining. Whether or not the land is included in a new cycle of activity planning, it cannot be included in a lease tract, "even if the surface owner refuses to submit anything...."[81] The regulations clearly state that:

On split estate lands ... where the surface is owned by a qualified surface owner, coal deposits that will be mined by other than underground mining techniques shall not be included in a lease sale without evidence of written consent from the qualified surface owner....[82]

While it is possible, as plaintiffs contend, that a surface owner who would otherwise be qualified might remain unknown to the Bureau, the occurrence of such an accident is highly speculative, and given minimal vigilance by surface owners in safeguarding their own lands, unlikely.

*Conclusion*

Plaintiffs have already obtained what they sought on counts I, II, III, and VII of their original Complaint. At this time plaintiffs' Motion for Summary Judgment is GRANTED as to counts VIII and X, and defendants' Cross–Motion for Summary Judgment is DENIED. Plaintiffs' Motion for Summary Judgment is DENIED as to counts V, VI, IX, and XI, and defendants' Cross–Motion for Summary Judgment is GRANTED.

As to count IV, within thirty days the Secretary of the Interior shall advise the court of a feasible schedule for completion of resource management plans for the Big Dry, Great Divide, Green River, and White River resource areas, and any other areas, if any, in which there is a potential for surface mining. Prior to completion of these RMPs, any party may petition the court to take additional appropriate action as may be warranted.

IT IS SO ORDERED.

---

77. 43 C.F.R. 3427.2(g) (1991).

78. 43 C.F.R. § 3427.2(k) (1991). *See also* Defendants' August 17, 1990 Supplemental Memorandum at Attachment C.

79. Complaint at 36.

80. Plaintiffs' July 21, 1983 Memorandum in Support of Their Motion for Summary Judgment at 73 n. 55.

81. Defendants' August 26, 1983 Memorandum in Support of Their Cross–Motion for Summary Judgment at 91 n. 1.

82. 43 C.F.R. § 3427.1 (1991).